IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 10, 2009

## STATE OF TENNESSEE v. LIONEL E. SHERRON

**Direct Appeal from the Circuit Court for Madison County**
**No. 07-625     Donald H. Allen, Judge**

**No. W2008-02666-CCA-R3-CD   -   Filed December 11, 2009**

A jury convicted the defendant, Lionel E. Sherron, of attempted voluntary manslaughter, reckless aggravated assault, and reckless endangerment by use of a deadly weapon. The trial court sentenced the defendant as a Range II, multiple offender to an effective nine-year sentence in the Tennessee Department of Correction. On appeal, the defendant argues that the evidence was insufficient for a jury to find him guilty. After review of the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Robert W. Wedemeyer, JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Lionel E. Sherron.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Jerry Woodall , District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Background

The Madison County Grand Jury indicted the defendant, Lionel E. Sherron, on two counts of attempted second degree murder, two counts of aggravated assault, and one count of reckless endangerment. Before trial, the court granted motions for judgment of acquittal for one attempted second degree murder charge and one aggravated assault charge. The court held a trial for the remaining charges and witnesses presented the following testimony.

Shawn Mays testified that he was shot on May 24, 2007. Mr. Mays stated that he was visiting his friend's grandmother's home when he was shot. According to Mr. Mays, it was "around 4:00 or 5:00" in the evening, and they were "in the backyard just chilling and stuff." A car wash was

nearby, and Mr. Mays could see it from the backyard. Mr. Mays said that after they had been in the backyard for about an hour his friend, Alex Jones, came to the backyard to visit. Mr. Mays testified that shortly after he arrived in the backyard, Mr. Jones went to a nearby store. Mr. Jones returned to the backyard from the store with a forty-ounce beer and began to drink it.

Mr. Mays stated that about fifteen to twenty minutes after Mr. Jones returned, a man and two children were walking up the street toward the car wash. Mr. Mays identified the defendant as the man that was walking with the children. Mr. Jones went over to the defendant and children. According to Mr. Mays, the defendant and Mr. Jones began to argue, but he did not know what they were arguing about. Mr. Mays said that the children were still with the defendant while the defendant and Mr. Jones argued. Mr. Mays stated that they argued for "[five] or [six] minutes[,]" and initially nothing about the argument concerned him.

Mr. Mays said that he became concerned when the defendant and Mr. Jones began shooting. Mr. Mays testified that he saw both men with guns. He further testified that Mr. Jones was facing away from him, and the defendant was facing him. Mr. Mays said that he saw the defendant point his gun at "people on the whole yard." According to Mr. Mays, the defendant was "just shooting at the dude who was shooting at him." Mr. Mays stated that while he was running toward the house, the defendant shot him in the back of his leg. He said that he was sure the defendant shot him because "[h]e had the gun." Mr. Mays also said that he saw the defendant shoot him. Mr. Mays testified that he did not discover that the defendant had shot him until "[a]fter the shooting . . . ." He "patted [himself] . . . [and] all the blood . . . just came down [his] leg and stuff." Mr. Mays said that his friend, Sylvester Hicks, took him to the hospital where he stayed for six or seven hours.

On cross-examination, Mr. Mays testified that he could not recall why Mr. Jones got so annoyed by the presence of the defendant and the children. Mr. Mays testified that neither the defendant nor the children had anything to say to Mr. Jones. He further testified that Mr. Jones left where he was, and he approached the defendant alone. He said that he only saw Mr. Jones have one beer, and he did not know if Mr. Jones used any drugs that day. According to Mr. Mays, Mr. Jones was the only person drinking. When asked why Mr. Jones would get so angry at the defendant and the children walking through a public place, the defendant replied that Mr. Jones "probably was already drunk and he [drank] another beer or whatever." Mr. Mays assumed that Mr. Jones had another beer because "he didn't act that way at first." He testified that Mr. Jones "lost his cool." Mr. Mays did not know that Mr. Jones was armed, and he stated that no one else in his group was armed. Mr. Mays agreed that if Mr. Jones would not have approached the defendant, this would not have happened.

On redirect examination, Mr. Mays stated that during the argument the defendant "was cool" and did not get angry until he started shooting. Mr. Mays said that both men were equally angry, and they were both shooting at each other. Mr. Mays testified about a map of the scene that he had drawn. The map showed the location of the stores, car wash, and a school. He also drew the locations of the people on the scene. On recross-examination, Mr. Mays said that the defendant was "minding his own business" and did not initiate the confrontation. Mr. Mays admitted that Mr. Jones put the defendant in a "difficult predicament."

-2-

Shelly Tackart testified that she was a registered nurse at the Jackson General Hospital Emergency Room. On May 24, 2007, she was working in trauma and received Shawn Mays as a patient. According to Ms. Tackart "someone dropped [Mr. Mays] off at the front door[,] [and] [h]e came back to the room in a wheelchair." When Ms. Tackart first saw Mr. Mays "he was stable [and] in a lot of pain." Ms. Tackart stated that Mr. Mays "had a hole in his right leg." Ms. Tackart treated Mr. Mays with "[x]-rays, pain medication, [a] tetanus shot, bandaging, [and] cleansing his wound." She said that Mr. May's blood "was saturating his clothes." She characterized his injury as "a moderate injury." Ms. Tackart discovered that a bullet caused the hole, and she recovered the bullet from his "right back pants pocket." After she retrieved the bullet, she "put it in a sterile specimen cup and held onto it until officers got there to retrieve it." She turned the bullet over to the Jackson Police Department.

Twelve-year-old Alex Mitchell testified that on or around May 24 or 25 someone shot his cousin Breyon Currie. Alex stated that he was walking near the car wash on Whitehall Street with the defendant and Breyon, and the defendant stopped to talk to someone for "three minutes." Alex testified that initially the men did not seem angry, but "when they stopped talking, one of them looked mad." He stated that "[t]he other guy" was angry, and not the defendant. While the men were talking, Alex could only see the back of the defendant's head and a little of the other man's face. He said that when the defendant paused to talk, he and Breyon "stopped and when [they] got to the end of the car wash, someone . . . started shooting." Alex stated that the "other guy" fired eight shots; however, in his statement to the police he said that the man fired six shots. Alex further stated that he heard five shots from behind. In his statement, Alex told the police that the defendant "said that the guy that was shooting looked like the same guy that robbed [the defendant] . . . ." Alex said that Breyon was shot during the altercation.

After the shooting stopped, Alex and Breyon began walking to Alex's mother's house, and a man on the sidewalk asked them if they needed help. The defendant and the man on the sidewalk carried Breyon to Alex's mother's house, and the man on the sidewalk took Breyon to the hospital. Alex testified that initially neither he nor the defendant accompanied Breyon to the hospital. Eventually Breyon's mother picked up Alex and the defendant and drove them to the hospital.

On cross-examination Alex testified that he, Breyon, and the defendant were not looking for trouble when they walked to the store. He stated that the defendant approached Mr. Jones and they started talking. He further stated that Mr. Jones was shooting at him, the defendant, and Breyon. He said that he did not run initially and thought that Mr. Jones "was just playing around. [H]e thought he had a BB gun." On recross-examination, Alex testified that the defendant did not have a gun.

Sylvester Hicks testified that on May 24 the police arrested and questioned him about this case. At the time of the shooting, Mr. Hicks was in a store across the street from the car wash. Mr. Hicks stated that there were "a lot of people" around the store. He knew some people that were "up on the hill on the corner of Whitehall and Preston[,]" and he went over to speak to them before he went into the store. Mr. Hicks testified that he knew some of the people on the hill that Mr. Jones knew; however, he was not personally acquainted with Mr. Jones. Mr. Hicks said that he only "knew of him." According to Mr. Hicks, there "was a lot of drinking . . . going on" before he left

to go to the store. He stated that Mr. Jones was drinking "a lot," and "[h]e took his bottle he was drinking and he struck out toward the car wash."

Mr. Hicks left the hill and went to the store. After he left the store, he saw Mr. Jones talking to a man. Many children were out there, and Mr. Hicks did not know whether any of the children were with the man to whom Mr. Jones was talking. Mr. Hicks was getting in his car, and he heard gunshots. Mr. Hicks stated that "one of the bullets hit [his] back windshield and one of them went on the side of the car and one hit the license [plate] of the car." He could not tell from where the bullets were coming.

Mr. Hicks testified that when he heard the shots "[he] pulled out, [he] made a left on Whitehall and made a left on Preston. When [he] made the left on Preston, Shawn Mays was coming down the hall [sic]." Mr. Hicks stated that he took Mr. Mays to the hospital. He said that he knew Mr. Mays before the shooting because they went to school together and lived in the same neighborhood. Mr. Hicks said that right after he dropped Mr. Mays off at the hospital, the police came to his home and looked at his car.

On cross-examination, Mr. Hicks testified that he and Mr. Jones left the hill at the same time. Mr. Hicks stated Mr. Jones used profanity when he was talking. Mr. Hicks recalled that Mr. Jones "was already roused up when [he] walked up there." Mr. Hicks said that he personally saw Mr. Jones drink a "40 oz. of 08 800" and some type of brown liquor.

On redirect examination, Mr. Hicks reviewed the statement that he gave to police where he said one man was wearing blue jeans and one had on a black shirt. Mr. Hicks could not recall who wore which clothing. Mr. Hicks said that he wore glasses and could not see the face of the man to whom Mr. Jones was talking. Mr. Hicks also said that he had been drinking that day and was not paying close attention to the argument. He did remember that the men were face to face, and their conversation did not appear to be an argument. Mr. Hicks stated that the shots were coming from the direction of the house on the hill. On recross-examination, Mr. Hicks testified that he did not see the defendant shoot Mr. Mays.

Officer James Singleton, of the Jackson Police Department, testified that on May 24 or 25, 2007, he investigated a shooting near Whitehall and Jackson Streets. Officer Singleton found out about the shooting through a dispatch, and he was the first officer on the scene. He arrived "[w]ithin a matter of five (5) to ten (10) minutes" and began to investigate. Officer Singleton stated that during his investigation he never considered Mr. Mays a suspect, and he did not receive any information that would lead him to believe that Mr. Mays was involved. On cross-examination, Officer Singleton testified that he was not the only investigator involved in this case.

Officer Kevin Hulsey, of the Jackson Police Department, testified that he also investigated the crime scene in this case. As part of his investigation, Officer Hulsey took photographs of the scene and collected shell casings. Officer Hulsey identified and described photographs of the crime scene, ten shell casings, and a vehicle that was "shot up." He stated that a photograph of the crime scene depicted a brick wall that was part of a stall at the car wash. When he described the picture

of the shell casings, Officer Hulsey stated that they were close to the vacuum at the car wash. He further stated that he did not find shell casings outside the vacuum area. He testified that someone had to have fired a gun for casings to be present.

Officer Hulsey photographed a vehicle parked near 338 Stonewall Street. Officer Hulsey discovered that "the rear passenger side door had a bullet hole in it. The back window was shot up. And [the vehicle] also had a bullet hole in the rear tag." He also found a bullet under the front driver's side seat. Officer Hulsey was not sure whose car it was, and he stated that a sergeant advised him to process the vehicle as part of the crime scene. On cross-examination, Officer Hulsey testified that he was unable to determine when the bullet hit the car or when the bullet shattered the back window.

Lieutenant Patrick Willis testified that as a lieutenant with the Jackson Police Department he investigates violent crimes and gang crimes, and he was an investigator involved in this case. He stated that they developed the defendant as a suspect, and he went to the home that the defendant shared with his girlfriend. The defendant's girlfriend consented to a search of the home. The investigators searched the home and found three spent .38 casings and "a bag of 22 ammunition." Lieutenant Willis stated that he "recovered a black bandana lying in the floor in the living room."

On cross-examination, Lieutenant Willis testified that a spent casing is essentially a used bullet. Lieutenant Willis stated that the ammunition he found was unused. He did not link the spent casings, the ammunition, or the black bandana to the shooting that occurred in this case. On redirect examination, Lieutenant Willis stated that he could not personally link the evidence he found to this case because he was not the primary investigator for this case.

Steve Scott, an employee of the Tennessee Bureau of Investigation Crime Laboratory, testified that he conducted tests on items that he received from the Jackson Police Department. He stated that he received the following items:

> [A] [.]38 caliber Rossi revolver, three (3) cartridge cases or fired brass cartridge cases that had been removed from that revolver. Three (3) live cartridges that had been removed from that revolver. . . . [T]hree (3) additional fired cartridge cases from . . . . 621 Whitehall. [He] received some 22 caliber ammunition from Whitehall. [He] also received a bullet from a vehicle belonging to Hicks. . . . [He] also received a bullet from the wallet of a victim by the last name of Mays. And ten (10) [.]380 auto cartridge cases from Whitehall. And then another bulled fragment from the Hicks vehicle.

Mr. Scott stated that he tested the revolver, which the police retrieved from Jackson Street, by looking at the manufacturing information, loading it with live ammunition, and firing it to determine whether it was operable. He said that he "retained those bullets and cartridge cases as test bullets and cartridge cases to compare to other evidence that had been submitted." Mr. Scott compared the three cartridge cases from the revolver and the cartridge cases recovered from 621 Whitehall Street with the test bullets. He stated that "this particular revolver does not mark cartridge

cases very well. . . . [a]nd [he] could not conclusively match those three (3) fired cartridge cases to [his] test cartridge cases." He further stated that the three cartridge cases found at 621 Whitehall Street were "very well marked," came from the same firearm, "[a]nd they did not come from that [.]38 caliber revolver" that he was testing. Mr. Scott testified that the revolver that he tested could hold six bullets if fully loaded.

Mr. Scott tested the cartridge cases by looking at the manufacturer information, firing the gun with the same type of ammunition, and comparing the test cartridge with the evidence cartridge under a microscope. He stated that he tested the bullet from the door of Mr. Hicks's vehicle and determined that it was "a [.]380 auto caliber bullet that is a different caliber than the [.]38 revolver that [he] spoke about earlier. That bullet could not have come from that revolver. It is the wrong size and the wrong caliber to have been fired in a revolver of that design." Mr. Scott also tested the bullet retrieved from Mr. Mays's wallet. He stated that "[t]here are quite a lot of similarities between the two [bullets], but not enough similarities for [him] to conclusively say that these two bullets came through the barrel of the same firearm." He further stated that the brand of the bullets and the bullets contacting the metal on Mr. Hicks's car, could affect the characteristics of the bullets making him unable to draw a conclusion. Mr. Scott determined that the bullets he tested were both ".380s."

Mr. Scott tested the ten .380 auto cartridge cases retrieved from 621 Whitehall Street by determining their manufacturer and caliber and comparing them under a microscope. He concluded that only one gun had fired all of the cartridge cases. Mr. Scott said that the gun was "most likely a Hi-point firearm." Mr. Scott stated that the bullets from the car, the bullet from Mr. Mays's wallet, and the ten cartridge cases that he tested were all .380 automatics. He further stated that the bullets possibly could have come from the cartridge cases.

On cross-examination, Mr. Scott testified that he was "not for sure" that the bullet retrieved from Mr. Mays's wallet came from the Hi-point firearm "because [he] was not able to match it to a firearm . . . ." He further testified that he could not "say that [the bullet] came from a particular firearm." On redirect examination, Mr. Scott stated that he would need the gun to conclusively determine whether it fired the bullet retrieved from Mr. Mays's wallet. He said that he could state with certainty that "[t]hey are [.]380 auto caliber bullets" and a .38 firearm could not have fired them.

The defendant called Alex Jones who testified that on May 24, 2007, he was at a car wash on Whitehall Street with "Shawn Mays, Cedric Harris and Mario." He stated that he saw the defendant with two children at the car wash. Mr. Jones testified that he did not know the defendant. According to Mr. Jones, the defendant offended him when "he wouldn't shake [his] hand." Mr. Jones asked the defendant to shake his hand "[b]ecause [he] thought [the defendant] was something that he wasn't." Mr. Jones stated that he thought the defendant was in a gang, but he was not. He recalled that on the day of the shooting, the defendant was wearing a black hat and a black shirt. Mr. Jones said that he had not been drinking or smoking that day, and he became angry because the defendant "disrespected [him]." Mr. Jones testified that he shot at the defendant six times after the defendant disrespected him. He further testified that he shot at the defendant to "scare him." Mr. Jones stated that the defendant did not retaliate against him. He further stated that the defendant was

not causing trouble and that he approached the defendant to cause trouble. Mr. Jones said that the defendant could not have shot anyone.

On cross-examination, Mr. Jones testified that he shot at the defendant with a .38 revolver. He stated that Mr. Mays was behind him when he shot at the defendant. Mr. Jones said that when the defendant did not shake his hand, he learned that the defendant was not who he thought he was. Although Mr. Jones got angry when the defendant refused to shake his hand, he said that the defendant did not get angry. The defendant attempted to walk toward Jackson Street to get away from Mr. Jones, and Mr. Jones shot at the defendant as he was walking away. According to Mr. Jones, there were "a lot of people out there." Mr. Jones did not "know who had a gun, but [he knew the defendant] didn't have a gun." Mr. Jones said that after the shooting he "went back to Jackson Street" where the police arrested him. He stated that a picture of a .38 revolver looked like the gun that he used to fire the six shots.

On redirect examination, Mr. Jones stated that Desmond McCorkle was with him when the police arrested him. He further stated that he was intoxicated at the time of the arrest. On recross-examination, Mr. Jones testified that he did not know where Mr. McCorkle was during the shooting, and he did not see him with a gun.

The defendant testified that on May 24, 2007, he was with Breyon and Alex near the car wash on Whitehall Street, and they were walking to the store. The defendant stated that while they were on their way to the store, Mr. Jones yelled "black on black." He said that Mr. Jones "kept hollering it out. So, [he] turned around and [Mr. Jones] was staring in [his] direction." Mr. Jones asked the defendant to come over to him. According to the defendant, Mr. Jones said that he knew him from somewhere and attempted to shake his hand. The defendant advised Mr. Jones that they did not know each other, and Mr. Jones told him that he was on the wrong side of the street. The defendant said that initially he "was terrified" when Mr. Jones confronted him. He also said that Mr. Jones's demeanor was "[s]louchy" and "somewhat drunk[.]" The defendant told Mr. Jones that he did not want any trouble and walked away. The defendant testified that when he "got back to close to where the kids was [sic] at, . . . [he] started hearing gun shots. . . ." After he heard the initial gunshots, the defendant saw people running away, and he ran toward the last bay at the car wash. He continued to run toward a store and did not know if someone was running after him. When he realized that no one was following him, he began to look for the two boys that were with him. The defendant stated that the boys "had ran to Whitehall School," and he "was waiting for them to come on over . . . ." After the boys came across the street, the defendant was "trying to carry Breyon" down the street, and a man asked if they needed help. The man helped him carry Breyon away from the scene.

The defendant testified that was he did not carry a firearm. He said that he was wearing "a black hat, black shirt, blue khaki pants and tan boots" that day. The defendant stated that he was unaware that dressing like that could cause problems in this neighborhood because he "and [his] girl had just moved over there [in] March or April . . . . And the whole area it's not no [sic] just one particular gang[;] . . . [i]t's like a neutral ground . . . ." He further stated that if he had known dressing in those colors would have caused danger to him and the children, he "wouldn't even walk down the street . . . ." The defendant said that he did not know Shawn Mays or Alex Jones, and he

agreed that this situation would not have occurred but for Alex Jones's actions. The defendant denied that he attempted to commit the second degree murder of Shawn Mays, committed aggravated assault against Shawn Mays, and recklessly endangered anyone.

On cross-examination, the defendant testified that Mr. Jones lied about being intoxicated at the time of the shooting. The defendant explained that he had the bullets and shell casings in his home because his neighbor had used a pistol to make a dog leave the defendant's backyard. According to the defendant, the neighbor disposed of the gun, and the defendant kept the bullets and shell casings. The defendant stated that he did not have a gun that day and that he was not supposed to own a gun because he lost his right to carry a gun. The defendant admitted that he served five years in jail for attempted especially aggravated robbery. He said that after the shooting occurred, he went "on the other side of [the] Lincoln Court area" because he "didn't want to be in the area no [sic] more."

The state called Peggy McNairy, Shawn Mays's mother, as a rebuttal witness. Ms. McNairy testified that she found out that her son had been shot when it happened. She stated that when she went to the hospital to see her son, the defendant told her he was "sorry for shooting [her] son" and that he "was only protecting [his] family." McNairy said the conversation "was very short" and that was all that the defendant said.

On cross-examination, Ms. McNairy stated that she waited until the trial date to tell the court this information because "everything was happening so fast . . . ." She stated that "[a]fter he apologized, it was just a done deal." She said that she "just remembered" the conversation when she "was coming up [the elevator] . . . because [she] takes a lot of medication."

On redirect examination, Ms. McNairy testified that the police did not talk to her about the incident. She said that after the defendant talked to her, someone at the hospital asked her if she knew anything about what happened, and she told them that she did not.

In rebuttal, the defendant testified that he never spoke with Ms. McNairy, and his trial was his "first time even knowing that she was Shawn Mays [sic] mother." He stated that he did not talk to anyone, "except for [his] girl and her family that was there." He further stated that he did not "talk to Shawn Mays, not Shawn Mays mother, not Shawn Mays brother, no Shawn Mays nothing [sic] because [he] didn't even know [that the] dude had got shot." He said that he did not go to the hospital, and he only knew that Breyon had been shot.

After hearing the evidence, the jury convicted the defendant of the lesser included offense of attempted voluntary manslaughter and the indicted offenses of reckless aggravated assault and reckless endangerment by the use of a deadly weapon. The trial court sentenced the defendant to two concurrent six-year sentences at 30 percent and a three-year sentence at 30 percent for an effective nine year sentence. The court ordered the defendant to serve his sentences in the Tennessee Department of Correction. The defendant timely filed a motion for new trial, which the trial court denied. In the order denying the defendant's motion for new trial, the trial court ordered that the defendant's conviction for attempted voluntary manslaughter merge with his conviction for reckless aggravated assault. The defendant now appeals.

Analysis

The defendant argues that the evidence was insufficient to sustain his convictions because the state did not prove every element of the offenses. Specifically the defendant contends that Mr. Jones was the one who became upset and began shooting, and the defendant did not have a gun. The defendant asserts that the state did not prove his guilt beyond a reasonable doubt.

It is well established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given to the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

A grand jury indicted the defendant for attempted second degree murder; however, the jury found him guilty of the lesser included offense of attempted voluntary manslaughter. The trial court merged the attempted voluntary manslaughter conviction into the aggravated assault conviction.

A defendant is guilty of voluntary manslaughter when he or she intentionally or knowingly kills "another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). A defendant is guilty of criminal attempt when he or she acts "with the kind of culpability otherwise required for the offense," and engages in one of the following activities:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believed them to be;

> (2) Acts with intent to cause a result that is an element of the offense if the circumstances surrounding the conduct were as the person believed them to be; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person

believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a). "The core elements of attempted voluntary manslaughter are that the defendant acts intentionally to complete a course of action that would constitute an intentional or knowing killing of another in the heat of passion with adequate provocation which is a substantial step towards the commission of voluntary manslaughter." *Muhammad v. State,* No. E2007-00748-CCA-R3-PC, 2009 WL 400633 at *9 (Tenn. Crim. App. at Knoxville, Feb. 18, 2009).

To obtain a conviction for reckless aggravated assault the state had to prove that the defendant recklessly committed an assault as defined below and caused serious bodily injury to another; or used or displayed a deadly weapon. *See* Tenn. Code Ann. § 39-13-102(a)(A), (B). A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;
(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

*Id.* § 39-13-101(a)(1)-(3). "'Reckless' refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 39-11-302(c). To establish the defendant's guilt of reckless endangerment with a deadly weapon, the state had to prove that the defendant recklessly engaged in conduct that placed or may have placed another person in imminent danger of death or serious bodily injury. *See Id.* § 39-13-103(a).

Examining the evidence in the light most favorable to the state, we conclude the evidence is sufficient to support the defendant's convictions. At trial, the evidence established that the defendant was involved in an altercation with Mr. Jones that led to them exchanging gunfire. It is undisputed that there were several people that were outside, and the men knew this. Exchanging gunfire on a crowded street was a substantial and unjustifiable risk and endangered several people, including children. While Mr. Hicks was getting into his vehicle, it was riddled with bullets. Mr. James and the defendant also wounded two innocent bystanders because of their shooting. Mr. Mays testified that the defendant pointed his gun at the people outside, and he was sure that the defendant shot him because the defendant "had the gun." Mr. Jones testified that he used a .38 revolver when he shot at the defendant. The casings retrieved from the scene of the shooting and the bullet retrieved from Mr. Mays's leg were .380s. Moreover, after the shooting, Breyon's mother took the defendant to the hospital, and while the defendant was there he apologized for shooting Mr. Mays. By convicting the defendant, the jury obviously resolved all conflicts in favor of the state and accredited the testimony of the state's witnesses. Accordingly, we conclude that the evidence submitted at trial was sufficient to sustain the defendant's convictions for attempted voluntary

manslaughter, reckless aggravated assault, and reckless endangerment with a deadly weapon. *See Reid*, 91 S.W.3d at 277 (Tenn. 2002). Therefore, the defendant is not entitled relief.

Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE